Julie Cavanaugh-Bill (NV Bar No. 11533)
Cavanaugh-Bill Law Offices, LLC
401 Railroad Street, Suite 307
Elko, NV 89801
Tel: (775) 753-4357
Fax: (775) 753-4360
julie@cblawoffices.org

Jennifer Rose Schwartz (OSB No. 072978), *application for Pro Hac Vice to be filed*
WildEarth Guardians
P.O. Box 13086
Portland, OR 97213
(503) 780-8281
jschwartz@wildearthguardians.org
*Will comply with LR IA 11-2 within 14 days*

Talasi B. Brooks (ISB No. 9712), *application for Pro Hac Vice to be filed*
Western Watersheds Project
P.O. Box 2863
Boise ID 83701
Tel: (208) 336-9077
tbrooks@westernwatersheds.org
*Will comply with LR IA 11-2 within 14 days*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| WILDEARTH GUARDIANS and WESTERN WATERSHEDS PROJECT, <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. DEPARTMENT OF AGRICULTURE ANIMAL AND PLANT HEALTH INSPECTION SERVICE WILDLIFE SERVICES, U.S. FOREST SERVICE, and BUREAU OF LAND MANAGEMENT, <br><br> Defendants. | Case No.: _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT - 1

**INTRODUCTION**

1.      Every year, our nation's most majestic animals, including wolves, bears, coyotes, bobcats and mountain lions, are poisoned, trapped and gunned down by Wildlife Services, an agency within the United States Department of Agriculture ("USDA"), Animal and Plant Health Inspection Service (hereinafter "APHIS" or "Wildlife Services"). Funded with millions of taxpayer dollars, and without modern scientific support, this program uses cruel and often archaic methods to capture and kill wildlife from their native ecosystems, largely at the behest of livestock producers. Across Nevada, Wildlife Services uses fixed-wing aircraft and helicopters to aerially shoot coyotes; body-gripping traps, neck snares and leghold traps to kill mountain lions, black bears, bobcats, badgers, coyotes, skunks, hares, ground squirrels, beaver and foxes; gas cartridges and poisons to exterminate coyotes in their dens; M-44 devices (also known as "sodium cyanide bombs") to kill canines like foxes and coyotes; and other poisons to annually eliminate thousands of native birds like ravens. Wildlife Services' indiscriminate killing methods have also resulted in scores of unintentional animal deaths and injuries nationwide, including federally-protected endangered and threatened species and even family pets.

2.      Plaintiffs WildEarth Guardians ("Guardians") and Western Watersheds Project ("WWP") challenge Nevada (NV)-Wildlife Services' July 2020 *Final Environmental Assessment: Predator Damage Management in Nevada* ("Final 2020 EA" or "2020 Nevada PDM EA") and associated Decision Notice/Finding of No Significant Impact ("DN/FONSI"). These decision documents purport to authorize NV-Wildlife Services to continue, as well as expand, its program of aerial gunning, poisoning, trapping, and other killing of coyotes, mountain lions, ravens, and a host of other wildlife across Nevada without fully disclosing or adequately analyzing environmental impacts, in violation of the National Environmental Policy

COMPLAINT - 2

Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and its implementing regulations, 40 C.F.R. §§ 1500-1508,[1] issued by the Council on Environmental Quality ("CEQ").

3.  Even though it devotes millions of dollars and thousands of person-hours each year to aerial gunning, poisoning, shooting, trapping, and otherwise killing thousands of animals across Nevada, and even though there is a growing body of science contesting the efficacy of these actions and pointing out their adverse environmental impacts, NV-Wildlife Services has unlawfully refused to prepare a comprehensive Environmental Impact Statement ("EIS") disclosing the direct, indirect, and cumulative effects of its Nevada "predator damage management" activities, as required by NEPA.

4.  A full EIS is required in light of the potentially significant environmental effects of NV-Wildlife Services' statewide predator damage management program ("PDM"), including the decision to allow predator control activities to resume and potentially expand within congressionally designated Wilderness Areas and agency-designated Wilderness Study Areas. As discussed *infra* ¶ 75, pursuant to the settlement agreement reached in *WildEarth Guardians v. U.S. Dep't of Agric., APHIS*, No. 2:12-cv-00716-MMD-PAL (ECF No. 67-1, filed October 5, 2016), Wildlife Services ceased predator control activities in Wilderness Areas and Wilderness Study Areas until adopting the 2020 DN/FONSI and issuing the 2021 Annual Work Plans challenged herein.

5.  NV-Wildlife Services' killing of native wildlife in designated Wildernesses for the stated purpose of protecting private agricultural interests (*i.e.*, preventing or reducing future

---

[1] All citations are to the 1978 Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. Part 1500, which were in effect at the time Wildlife Services issued the 2020 Nevada PDM EA and DN/FONSI challenged herein and are the CEQ regulations that these decisional documents purport to follow. On September 14, 2020, the Trump Administration issued a final rule revising the CEQ regulations. *See* 85 Fed. Reg. 43304 (July 16, 2020) (Update to the Regulations Implementing the Procedural Provisions of the NEPA, Final Rule).

losses of commercial livestock), with the approval of Defendant U.S. Bureau of Land Management ("the Bureau" or "BLM") through the Nevada BLM 2021 Annual Work Plan and the Bureau's associated Decision Record/FONSI and Minimum Requirements Decision Guide, also violates the Wilderness Act, 16 U.S.C. §§ 1131-1136, by sanctioning an impermissible "commercial enterprise" within designated Wilderness Areas, *id.* § 1133(c), without demonstrating that lethal PDM is either necessary for a valid "wilderness purpose," *id.* § 1133(d)(5), or necessary for preventing serious losses of domestic livestock, and by offending the Act's mandate to preserve the untrammeled and "natural conditions" that are a part of the "wilderness character" of the applicable designated Wildernesses, *id.* §§ 1131, 1133. Defendants Wildlife Services and the Bureau have similarly violated Nevada's Wilderness enabling legislation because lethal control of wildlife in Bureau-managed Wildernesses for the stated purpose of protecting commercial livestock is outside the scope of permissible wildlife management activities under The Lincoln County Conservation, Recreation, and Development Act of 2004 (Pub. L. No. 108-424) ("Lincoln County Conservation Act") and The White Pine County Conservation, Recreation, and Development Act, or Pam White Wilderness Act, of 2006 (Pub. L. No. 109-432) ("White Pine County Conservation Act").

6. Plaintiffs bring related claims against Defendants U.S. Forest Service and the Bureau for authorizing NV-Wildlife Services to annually kill native wildlife on federal public lands, including within ecologically significant and specially designated areas like Wildernesses and Wilderness Study Areas, through Annual Work Plans. The Annual Work Plans provide no public disclosure of the efficacy or local environmental impacts of Wildlife Services' activities and do not demonstrate consistency with federal land management requirements.[2] By approving

---

[2] The Bureau's April 2021 Decision Record/FONSI and Determination of NEPA Adequacy for *BLM Adoption of Activities Proposed and Analyzed in BLM-Administered Designated*

NV-Wildlife Services' wildlife killing on these federal public lands without legally adequate site-specific environmental analyses, the Bureau and Forest Service violate NEPA.

7.      NV-Wildlife Services' annual killing of native predators, including coyotes and thousands of ravens, to purportedly "benefit" sage grouse is also unlawful because it exceeds the agency's statutory authority under the Animal Damage Control Act, which only allows Wildlife Services to take actions deemed "necessary" to control "injurious animal species." 7 U.S.C. § 426. The 2020 Nevada PDM EA and DN/FONSI fail to establish that ravens and coyotes are depressing or otherwise injuring populations of sage-grouse and are thus "injurious," and hence Wildlife Services lacks the statutory authority to undertake the killing of native wildlife for this stated purpose.

8.      Accordingly, Plaintiffs request that this Court reverse, vacate, and set aside the 2020 Nevada PDM EA and DN/FONSI and the 2021 Forest Service and BLM Annual Work Plans. Plaintiffs further request that this Court enjoin NV-Wildlife Services from conducting its PDM activities on the affected federal public lands unless and until Defendants have fully complied with federal law.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiffs' claims herein pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346(a)(2) (an agency of the United States as the defendant), and 5 U.S.C. §§ 701-706 (the Administrative Procedure Act, or "APA"). There now exists between the parties an actual, justiciable controversy within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

---

*Wilderness and Wilderness Study Areas in the Environmental Assessment: Predator Damage Management in Nevada* similarly fails to provide the requisite public disclosure and site-specific analysis of the full scope of PDM activities that BLM authorized under the Nevada BLM 2021 Annual Work Plan for the applicable BLM Districts in Nevada.

10.     The requested declaratory relief is authorized by 28 U.S.C. § 2201(a). The requested injunctive relief is authorized by 28 U.S.C. § 2202. An award of costs, attorneys' fees, and other expenses is authorized, should Plaintiffs prevail, by the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims herein occurred within this district, Plaintiffs have members who reside in this district, and this case includes a challenge to Defendants' activities in Nevada.

12.     This action is properly assigned to the Northern Division of this Court because a significant part of Defendants' actions challenged by Plaintiffs herein occurs in that Division.

## PARTIES

13.     Plaintiff WILDEARTH GUARDIANS is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians is headquartered in Santa Fe, New Mexico and has more than 190,000 members and supporters across the West. Many of Guardians' members live, work, and recreate in areas affected by Wildlife Services' activities in the State of Nevada.

14.     Plaintiff WESTERN WATERSHEDS PROJECT is a nonprofit membership organization with over 12,000 members and supporters and is dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West. WWP, as an organization and on behalf of its members, is concerned with and active in seeking to protect and improve wildlife and predator populations, natural resources, and ecological values of watersheds throughout the West and in Nevada. WWP is headquartered in Hailey, Idaho, and has additional staff and offices in other Western states.

COMPLAINT - 6

15.     Plaintiffs have a long history of working to protect and restore native wildlife species across the West. Guardians operates a wildlife program with campaigns focused on native carnivore protection and restoration as well as reigning in the controversial, cruel, and destructive practices of Wildlife Services, including the agency's use of poisoning, trapping, and aerial gunning methods. WWP's mission includes protecting and restoring western watersheds and wildlife through education, public policy initiatives, and legal advocacy, and WWP has been successful at challenging predator control and other initiatives harming native carnivores throughout the West. Plaintiffs also actively participate in the public NEPA process for Wildlife Services' PDM programs and activities in Nevada and other states nationwide. Plaintiffs regularly comment on Wildlife Services' activities and educate the public on the agency's killing of wildlife.

16.     Plaintiffs' staff, members, and supporters are dedicated to ensuring that Wildlife Services complies with all applicable federal laws. Wildlife Services' wildlife killing program in Nevada, along with its associated 2020 Nevada PDM EA and DN/FONSI, adversely affect Plaintiffs' interests in Nevada's wildlife—including coyotes, mountain lions, bobcats, black bears, gray wolves, ravens, and other species—that could intentionally or unintentionally be killed by Wildlife Services.

17.     Plaintiffs' members and supporters live and recreate in or near areas in Nevada where the implementation of Wildlife Services' wildlife killing program occurs or may occur under the challenged agency decisions—including federally-designated Wildernesses and Wilderness Study Areas. Plaintiffs' members and supporters engage in activities including hiking, observing wildlife, and other pursuits for health, recreational, scientific, spiritual, educational, aesthetic, professional, and other purposes. They enjoy observing, attempting to

observe, photographing, and studying wildlife, including signs of those species' presence in these areas. The opportunity to possibly view wildlife or their signs is of significant interest and value to Plaintiffs' members and supporters, and it increases their use and enjoyment of public lands and ecosystems in Nevada. Plaintiffs' members and supporters have regularly engaged in these activities in the past, and they intend to continue to do so in the upcoming months.

18.     Plaintiffs' members and supporters are concerned about the impacts of carnivore removal on carnivore populations, prey populations, non-target species, and their ecosystems. They are also concerned about the impacts of poisoning birds on bird populations, non-target species, and their ecosystems. They have strong interests in enjoying and experiencing the profound cultural, spiritual, recreational, and ecological benefits of Wildernesses and Wilderness Study Areas in their natural, untrammeled state, where robust populations of native carnivores can carry out their essential roles in balancing ecosystems, free of unnecessary persecution by humans. Finally, they are also concerned about the toxicants and traps used by Wildlife Services in Nevada, which place them and their companion animals at risk. Plaintiffs' members and supporters often walk or engage in outdoor recreation in areas where they, their loved ones, and/or their companion animals may be at risk due to M-44s, traps, and other harmful toxicants and devices introduced to the landscape by Wildlife Services.

19.     Plaintiffs' members and supporters also have a procedural interest in ensuring that Wildlife Services' activities comply with all applicable federal statutes and regulations. Guardians has worked to reform Wildlife Services' activities throughout the United States, including in Nevada. Plaintiffs and their members and supporters have an interest in preventing Wildlife Services from being involved in lethal wildlife damage management, particularly

predator control, and have an interest in promoting the use of more effective and proactive non-lethal alternatives that foster communities' coexistence with wildlife.

20.     The interests of Plaintiffs' members and supporters have been, and will continue to be, adversely affected and aggrieved by the Defendant agencies' failure to comply with NEPA and its implementing regulations, the Bureau and Wildlife Services' failure to comply with the Wilderness Act in approving lethal predator control activities in designated Wildernesses, and by Wildlife Services' activities that are *ultra vires* of the ADCA. These are actual, concrete, and particularized injuries caused by Defendants' violations of law, as set forth herein.

21.     The relief Plaintiffs seek in this Complaint would redress the injuries of their members and supporters. The relief Plaintiffs request, if granted, would prevent Wildlife Services from engaging in PDM activities unless and until it complies with federal law. Plaintiffs' requested relief, if granted, could also reduce the amount of lethal predator control and other wildlife killing conducted in Nevada. In particular, State agencies, local municipalities, and private livestock producers cannot completely replace Wildlife Services' activities as authorized through the 2020 Nevada PDM EA and DN/FONSI because they do not have the equipment or trained wildlife-killing personnel utilized by Wildlife Services.

22.     In sum, Plaintiffs' interests, and those of their members and supporters, have been, are being, and—unless this Court grants the requested relief—will continue to be harmed by Defendants' actions and inactions challenged in this Complaint. If this Court issues the relief requested, the harm to Plaintiffs' interests, and those of their members and supporters, will be redressed.

23.     Defendant USDA APHIS WILDLIFE SERVICES is an agency or instrumentality of the United States, within the USDA, whose responsible for carrying out "predator damage

control" and wildlife killings in Nevada and nationwide. Wildlife Services receives federal and cooperator funding to undertake wildlife damage management activities in Nevada, including for the protection of private commercial interests such as livestock grazing.

24.     Defendant U.S. FOREST SERVICE is an agency of the United States charged with managing certain federal lands in Nevada according to federal statutes and regulations. The Forest Service authorizes Wildlife Services to operate on lands it manages through Annual Work Plans.

25.     Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States charged with managing certain federal lands in Nevada according to federal statutes and regulations. The Bureau authorizes Wildlife Services to operate on lands it manages through Annual Work Plans.

## LEGAL FRAMEWORK

### I.   Animal Damage Control Act

26.     Wildlife Services draws its statutory mandate from the Animal Damage Control Act of 1931. 7 U.S.C. § 426. As originally written, Section 426 reads:

> The Secretary of Agriculture is authorized and directed to conduct such investigations, experiments, and tests as he may deem necessary in order to determine, demonstrate, and promulgate the best methods of eradication, suppression, or bringing under control on national forests and other areas of the public domain as well as on State, Territory, or privately owned lands of mountain lions, wolves, coyotes, bobcats, prairie dogs, gophers, ground squirrels, jack rabbits, and other animals injurious to agriculture, horticulture, forestry, animal husbandry, wild game animals, fur-bearing animals, and birds, and for the protection of stock and other domestic animals through the suppression of rabies and tularemia in predatory or other wild animals; and to conduct campaigns for the destruction or control of such animals: *Provided*, That in carrying out the provisions of this section the Secretary of Agriculture may cooperate with States, individuals, and public and private agencies, organizations, and institutions.

7 U.S.C. § 426 (1931).

27.     As amended in 2001, Section 426 now reads:

COMPLAINT - 10

> The Secretary of Agriculture may conduct a program of wildlife services with respect to injurious animal species and take any action the Secretary considers necessary in conducting the program. The Secretary shall administer the program in a manner consistent with all of the wildlife services authorities in effect on the day before October 28, 2000.

7 U.S.C. § 426 (2001).

28.     Upon information and belief, Wildlife Services has never promulgated regulations implementing or interpreting this authority. Nonetheless, Wildlife Services is subject to regulations promulgated by the Secretary of Agriculture under 7 U.S.C. Subtitle A and by APHIS under 7 U.S.C. Subtitle B Part 300.

29.     In carrying out its activities, Wildlife Services must comply with all other applicable federal laws, including those listed below.

**II.  National Environmental Policy Act**

30.     The National Environmental Policy Act ("NEPA") is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are (1) to ensure that agencies consider every significant aspect of the environmental impact of a proposed action and (2) to inform the public that the agency has considered environmental concerns in its decision-making process. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002).

31.     Moreover, "the NEPA process is intended to help public officials make decisions that are based on understanding of [sic] environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). The CEQ regulations "provide the direction to achieve this purpose." *Id.* To that end, "NEPA procedures must insure [sic] that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b). This "information must be of high

COMPLAINT - 11

quality," as "accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

32.     Under NEPA, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The phrase "human environment" is "interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14.

33.     To determine whether an action may be "significant"—triggering the requirement to prepare an EIS—the agency may first prepare an Environmental Assessment ("EA"). *Id.* § 1501.4(b). Significance determinations are governed by CEQ regulations, which require agencies to consider both the context of the action and the intensity of the environmental impacts. *Id.* § 1508.27.

34.     "Intensity" requires the agency to consider several factors, including potential effects on public health or safety, *id.* § 1508.27(b)(2); any "unique characteristics of the geographic area," including proximity to specially designated lands, *id.* § 1508.27(b)(3); effects that are "likely to be highly controversial," *id.* § 1508.27(b)(4); effects that are "highly uncertain or involve unique or unknown risks," *id.* § 1508.27(b)(5); the potential for "cumulatively significant impacts," *id.* § 1508.27(b)(7); and the potential for adverse effects to species listed under the Endangered Species Act ("ESA") (hereinafter "federally listed species") or ESA-designated critical habitat, *id.* § 1508.27(b)(9). These intensity factors may individually or collectively be sufficient to require an EIS. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

35.     If the agency determines that its action is not significant, and therefore that an EIS is not necessary, the agency must prepare a Finding of No Significant Impact ("FONSI"). *Id.* §

1501.4(e). A FONSI is a document that briefly explains why the proposed action "will not have a significant effect on the human environment." *Id.* § 1508.13.

36.     The environmental analysis, whether in an EA or an EIS, must disclose and analyze the direct, indirect, and cumulative effects of the proposed action on the environment. *Id.* § 1502.16. Direct effects are "caused by the action and occur at the same time and place," whereas indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8. Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* § 1508.7. An agency cannot avoid finding that a proposed action may be significant "by terming an action temporary or by breaking it down into small component parts." *Id.* § 1508.27(b)(7).

37.     Moreover, NEPA requires federal agencies, whether in an EA or an EIS, to take a "hard look" at the potential environmental consequences of a proposed action. *Kern*, 284 F.3d at 1066. To satisfy NEPA's hard look requirement, an agency must include quantified and detailed information, such as site-specific data, in its evaluation of potential environmental impacts. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998). "Without such information, neither the courts nor the public, in reviewing the [agency's] decisions, can be assured that the [agency] provided the hard look that it is required to provide" under NEPA. *Id.* NEPA's implementing regulations also require that an agency describe the environmental baseline of the areas to be affected, 40 C.F.R. § 1502.15, and address "appropriate mitigation measures not already included in the proposed action or alternative," 40 C.F.R. §§ 1502.14(f), 1502.16(h).

38.     Finally, NEPA requires federal agencies, whether in an EA or an EIS, to "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14. If an agency fails to examine a viable alternative, its analysis is rendered inadequate. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013).

**III.  Wilderness Act**

39.     The Wilderness Act of 1964 established the National Wilderness Preservation System, under which Congress may designate Wilderness Areas. 16 U.S.C. § 1131(a). "Wilderness" is defined as "an area where the earth and its community of life are untrammeled by man," where the land has retained "its primeval character and influence," and where the land has "been affected primarily by the forces of nature." *Id.* § 1131(c). Moreover, a Wilderness is an area that "is protected and managed so as to preserve its natural conditions," and provides "outstanding opportunities for solitude" or "primitive and unconfined" recreation. *Id.*

40.     Wilderness areas must "be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness" and so as to protect and preserve their "wilderness character." *Id.* § 1133(b).

41.     In furtherance of this goal, the Wilderness Act sets forth a broad prohibition on the operation of all commercial enterprise within designated Wilderness "[e]xcept as *specifically provided for* [in the Act]." *Id.* § 1133(c) (emphasis added).

42.     Accordingly, the Act expressly identifies certain nonconforming uses that are exceptions to its prohibition on "commercial enterprise." 16 U.S.C. § 1133(d)(1)-(4). The Act's prohibition on commercial enterprises must be enforced whenever one of the specified exceptions is not present. *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1062 (9th Cir. 2003) (*en banc*). Among the specific exceptions is the continuation of commercial

livestock grazing on national forest lands where such use was established prior to the Act's passage on September 3, 1964, subject to reasonable regulations deemed necessary by the Secretary of Agriculture. *Id.* § 1133(d)(4).

43.     During initial implementation of the Wilderness Act, the Forest Service saw that livestock grazing was to be continued, but imposed regulations such as prohibiting the development of structures like fences and stockponds. In response to those restrictive regulations, Congress issued guidelines on "Grazing in National Forest Wilderness Areas" in the House Committee Report (H.R. REP. NO. 96-617) accompanying the Colorado Wilderness Act of 1980, Pub. L. No. 96–560 at § 108, commonly known as the Congressional Grazing Guidelines, and added a statutory note to the Wilderness Act stating "the provisions of the Wilderness Act relating to grazing shall be interpreted and administered in accordance with the Congressional Grazing Guidelines."[3]

44.     The Congressional Grazing Guidelines present five "guidelines and policies" and a summary statement, which largely address the conditions under which an administering agency may authorize the maintenance, repair, reconstruction and construction of facilities (*e.g.*, fences, water lines and wells, and stock tanks), and the emergency use of motorized equipment, to support grazing operations in Wilderness Areas. H.R. REP. NO. 101-405, Appendix A. The Congressional Grazing Guidelines do not address "predator control" or make any mention of managing wildlife for the purported protection of commercial livestock in Wilderness Areas.

45.     The Wilderness Act's "special provisions" further provide that "commercial services" within Wilderness Areas may be performed only "to the extent necessary for activities

---

[3] The substantive language of this Report was duplicated in House Report 101-405, Appendix A, referenced in the Arizona Desert Wilderness Act of 1990, which extended to Bureau-managed wilderness lands the same grazing guidelines that Congress had applied to Forest Service lands a decade earlier. House Report 101-405, Appendix A is cited in subsequent legislation pertaining to Nevada wilderness designations, *see infra* ¶ 48.

which are proper for realizing the recreational or other wilderness purposes of the areas." *Id.* §

1133(d)(5). Among those purposes are "the public purposes of recreational, scenic, scientific,

educational, conservation, and historical use." *Id.* § 1133(b).

46.     Congress also enacted the Nevada Wilderness Protection Act of 1989, Pub. L.

No.101-195, which designated 13 new Forest Service Wilderness areas and one Forest Service

Wilderness area addition totaling 733,400 acres in Nevada. Section 4 directs management in

accordance with the Wilderness Act of 1964. *Id*. Section 6 allows continued livestock grazing

"where established before the date of enactment" in accordance with the Wilderness Act (16

U.S.C. 1133(d)(4)) and section 108 of Pub. L. No. 96-560, and requires the Secretary of

Agriculture to review all grazing management "to insure that such policies, practices, and

regulations fully conform with and implement the intent of Congress regarding grazing in such

areas" and to submit a report to Congress, at least every five years, detailing the progress made

by the Forest Service in carrying out these grazing related provisions.

47.     Congress subsequently enacted The Lincoln County Conservation, Recreation,

and Development Act of 2004 (Pub. L. No. 108-424) ("Lincoln County Conservation Act"),

which designated 14 new Bureau-managed Wilderness Areas totaling 768,294 acres in Nevada,

and The White Pine County Conservation, Recreation, and Development Act, or Pam White

Wilderness Act, of 2006 (Pub. L. No. 109-432) ("White Pine County Conservation Act"), which

designated 12 new Bureau-managed Wilderness Areas and two Bureau-managed Wilderness

Area additions totaling 558,133 acres in Nevada. In enacting the County Conservation Acts,

Congress expressly stated that it found these public lands to contain "priceless habitat" for

wildlife and that their preservation as Wilderness would benefit the County and all of the greater

United States by "ensuring the conservation of ecologically diverse habitat[.]" *Id*.

48.     Congress also established separate provisions for livestock grazing management and wildlife management in the County Conservation Acts. Both allow continued livestock grazing, "subject to [] reasonable regulations, policies, and practices" and consistent with the Wilderness Act of 1964 and Appendix A of House Report 101-405 (1990) (the "Congressional Grazing Guidelines"). Pub. L. No. 108-424 § 324(b); Pub. L. No. 109-432 § 204(b). Wildlife management, however, is limited to management activities that "maintain or restore fish and wildlife populations and habitats" within such designated Wildernesses if those activities are "consistent with relevant wilderness management plans," the original Wilderness Act of 1964, and "appropriate policies" such as those that allow for the occasional and temporary use of motorized vehicles if the Secretary determines such use "would promote healthy, viable, and more naturally distributed wildlife populations . . . ." Further, under the White Pine County Conservation Act, such management activities must be "necessary" to maintain or restore populations and habitats. White Pine County Conservation Act § 329(b); Lincoln County Conservation Act § 209(b).

49.     Although the Congressional Grazing Guidelines do not address lethal "control" or "management" of wildlife as a component of "grazing management" that should be allowed within Wilderness, and despite the fact that the five enumerated guidelines speak only to the continuation of grazing itself and the structures, facilities, and use of motorized equipment to support livestock grazing operations therein, the Forest Service and Bureau interpret the Congressional Grazing Guidelines' following broad summary statement as allowing lethal control of native wildlife in designated Wilderness for the perceived purpose of protecting commercial livestock from potential depredations: "the general rule of thumb on grazing management in wilderness should be that activities or facilities established prior to the date of an

area's designation as wilderness should be allowed to remain in place and may be replaced when

necessary for the permittee to properly administer the grazing program." H.R. REP. NO. 101-405.

50.     Both the Forest Service and Bureau have also issued policy directives that allow

lethal wildlife control in Wilderness areas where "necessary . . . to prevent serious losses of

domestic livestock." Forest Service Manual 2320, § 2323.33c; BLM Manual 6340. Upon

information and belief, the Defendant agencies have never promulgated regulations authorizing

PDM activities in designated Wilderness.

51.     In 2002, the U.S. District Court for the District of Arizona explained that because

"Congress is silent or, at most, ambivalent as to whether the Wilderness Act allows lethal

predator control to protect private livestock grazing in wilderness areas" that it was appropriate

to apply *Chevron* deference to the Forest Service's interpretation of the Act regarding this issue.

*Forest Guardians, et. al. v. APHIS, et. al.*, 99-cv-61-TUC-WDB, 2000 WL 34510092, *3-4 (D.

Ariz. Nov. 14, 2000). Applying *Chevron*, the district court held that the Forest Service's

interpretation of the Wilderness Act as allowing lethal predator control for the purpose of

protecting commercial livestock in Wilderness Areas was reasonable because: (1) the Wilderness

Act permits livestock grazing to continue where such use was already established prior to the

Act's passage and private livestock grazing "implicitly includes . . . lethal control of predators";

(2) the Congressional Grazing Guidelines generally states "that activities associated with private

livestock grazing should be permitted to continue . . ."; and (3) the legislative history of the Utah

Wilderness Act of 1984 mentions lethal predator control. *Id*. The Ninth Circuit, applying

*Skidmore* deference to the Forest Service's interpretation that livestock grazing "implicitly

includes . . . lethal control of predators[,]" affirmed, holding "the Act allows lethal predator

control where *necessary* to protect pre-existing grazing operations." *Forest Guardians*, 309 F.3d 1141, 1143 (2002) (emphasis added).

52.     In a subsequent *en banc* ruling, however, the Ninth Circuit held that "[b]ecause the aim of Congress in the Wilderness Act to prohibit commercial enterprise within designated wilderness is clear, we do not owe deference to the [agency's] determination regarding the permissibility of [a project or activity] if it is a commercial enterprise" that is not among the Act's "specific and express exceptions[.]" *Wilderness Soc'y*, 353 F.3d at 1062 (citing Act's "broad prohibition" on commercial enterprise, 16 U.S.C. § 1133(c), and its specifically enumerated exceptions, *id*. § 1133(d)).

**IV.  Federal Land Policy & Management Act**

53.     In 1976, under the Federal Land Policy and Management Act ("FLPMA"), Congress directed the Bureau to review Bureau-managed roadless areas of five thousand acres or more to determine if they have the wilderness characteristics described in the 1964 Wilderness Act. 43 U.S.C. § 1782(a). In 1980, pursuant to this direction, the Bureau designated about 25 million acres of land that met these standards as Wilderness Study Areas. Since that time, Congress has reviewed some of these areas and has designated some as wilderness and released others for non-wilderness uses. Until Congress makes a final determination on a Wilderness Study Area, the Bureau must manage such lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness . . . ." *Id*. § 1782(c).

54.     FLPMA additionally requires the Bureau to prepare Resource Management Plans ("RMPs") for the various districts under its control. 43 U.S.C. § 1712. The Bureau must ensure that site-specific management actions are consistent with and conform to the governing RMPs,

including overlaying Wilderness Management Plans. 43 U.S.C. § 1732(a); 43 C.F.R. §§ 1601.0-5(b); 1610.5-3(a).

### V. Administrative Procedure Act

55.    Because NEPA and the Wilderness Act do not contain internal standards of review, the Administrative Procedure Act ("APA") governs judicial review. Under the APA, courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

56.    In addition, the APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Courts must also reverse and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

<strong>STATEMENT OF FACTS</strong>

### I. History and Overview of Wildlife Services' National Killing Program

57.    Wildlife Services and its precursors have specialized in killing wildlife for more than a century. In 1931, Congress passed the Animal Damage Control Act, which authorized the Secretary of Agriculture to "promulgate the best methods of eradication, suppression, or bringing under control" a whole host of species, including "mountain lions, wolves, coyotes, bobcats, prairie dogs, and gophers," for the benefit of agribusiness. As a result, the government initiated massive poisoning and trapping campaigns that severely diminished America's wildlife, from rodents to bird to native carnivores. By the 1940s, government sanctioned wildlife-killing programs had contributed to the extirpation of species such as wolves and grizzly bears from the contiguous U.S.

58.     In 1964, Secretary of the Interior Stewart L. Udall's Advisory Board on Wildlife and Game Management issued the "Leopold Report" to Congress (named for its chairman, Dr. A. Starker Leopold, son of pioneering ecologist Aldo Leopold). The Leopold Report described the wildlife-killing agency as a "semi-autonomous bureaucracy whose function in localities bears scant relationship to real need and less still to scientific management." It noted the agency's penchant for indiscriminate wildlife killing through the use of traps and poisons, particularly Compound 1080. Although the Leopold Report established that the American populace especially favored native carnivores, the agency and decision-makers continued to favor agribusiness over the prevailing values of most Americans, as they do today.

59.     In 1971, a panel chaired by Stanley A. Cain issued a second report to the U.S. Department of Interior and CEQ. The 207-page "Cain Report" lamented that the government's wildlife-killing program "contains a high degree of built-in resistance to change" and that monetary considerations favoring the livestock industry harmed native wildlife populations (Cain et al. 1971). The Cain Report called for substantive changes to wildlife management regimes by changing personnel and control methods, valuing "the whole spectrum of public interests and values," and asserting protections for native wildlife. Citing the Cain Report, in 1972, Richard Nixon banned the use of toxicants Compound 1080, sodium cyanide, strychnine and thallium by federal agents on public lands. Reversing Nixon's policy, the Ford and Reagan Administrations brought Compound 1080 and sodium cyanide back to public lands by the mid-1980s.

60.     In 2004, 2005 and 2006, the USDA's Office of Inspector General ("OIG") released audits revealing that APHIS was not in compliance with the Bioterrorism Preparedness and Response Act. The OIG's 2004 audit showed that Wildlife Services' aircraft (used to shoot wildlife from the air) were not secured and could potentially be used in terrorist attacks. In the

2005 audit, the OIG found that APHIS had not secured "dangerous biological agents and toxins." Sodium cyanide and Compound 1080 are particularly dangerous, as they can be used in chemical warfare and are extremely toxic to humans. In the 2006 audit, the OIG found that APHIS was not complying with regulations concerning the security of toxins, that it had not secured access from unauthorized persons, that individuals using toxicants did not have adequate training, and that inventories had not been maintained to prevent the illegal possession (theft), transfer or sale of these toxicants. The OIG selected 10 of 75 sites to visit, and none were in compliance with the Bioterrorism Preparedness and Response Act.

61.     In November 2007, Wildlife Services itself admitted that it had experienced a "wake of accidents" that involved its aerial gunning program, its hazardous chemicals inventory, and more. The aerial gunning program, for instance, has caused ten fatalities and 28 injuries to federal employees and contractors. In March 2008, the Environmental Protection Agency issued a notice of warning letter to Wildlife Services for its illegal and unsafe placement of M-44s[4] that resulted in the injury of a U.S. Fish and Wildlife Service biologist and the death of his dog.

62.     Over the past few decades, numerous individuals and/or their companion animals have been exposed to and injured by sodium cyanide from M-44 devices. The incidences described below are just a few examples.

63.     In 2003, Dennis Slaugh accidentally triggered an M-44 while recreating on federal public land in Utah. The device fired onto his chest and sodium cyanide powder hit his

[4] M-44s are spring-loaded devices, topped with smelly baits that lure carnivores. When a carnivore tugs on the M-44, a spring shoots a pellet of sodium cyanide into the animal's mouth. When the cyanide pellet mixes with moisture, it turns into a deadly vapor. Sodium cyanide morphs into hydrogen cyanide gas, which is easily absorbed by the lungs. The animal suffocates to death. Sodium cyanide is acutely toxic to both birds and mammals, and M-44s kill hundreds of non-target species (*e.g.*, bears, badgers, kit and swift foxes, bobcats, ringtail cats, javelinas, beavers, hawks, and pets) and thousands of target species (particularly coyotes and striped skunks) each year. By their very nature, M-44s are indiscriminate. As a result, M-44s pose a danger to pets and humans.

COMPLAINT - 22

face, entering his eyes. A blood test found that he had cyanide poisoning and he reported being severely disabled and unable to work after his encounter with the device. His 2018 death certificate listed cyanide poisoning as a contributing cause of death.

64.     In 2006, a U.S. Fish and Wildlife Service biologist's companion dog was lethally asphyxiated by an M-44 device that had been set by Wildlife Services on public land in Utah. The biologist was secondarily poisoned from handling his dog and became ill, suffering from a headache, faintness, and a metallic taste in his mouth.

65.     In 2017, while hiking on public land in Wyoming, a family's companion dogs died after being exposed to a sodium cyanide capsule that had been placed to target coyotes.

66.     Again in 2017, a 14-year-old boy was hospitalized for cyanide exposure after triggering an M-44 device near his home in Idaho. The boy's companion dog died.

67.     Despite these tragedies, as well as shifting public attitudes in favor of carnivore preservation and appreciation, public calls for a coexistence ethic based on nonlethal approaches for reducing the risk of wildlife-livestock conflicts, and negative publicity and reports such as those by the Leopold and Cain committees and the OIG, fundamental reforms of Wildlife Services have not occurred. Nor has APHIS re-evaluated the impact and effectiveness of its nationwide federal wildlife killing program.

68.     Not only do Wildlife Services' controversial killing programs cause tragedies like those listed above, but, as the Sacramento Bee detailed in 2012 in a prize-winning series of stories, Wildlife Services' programs are expensive, ineffective, and capable of setting off chain reactions of unintended consequences. The Sacramento Bee series documented ethical problems including employees hiding non-target animals killed and large numbers of reported killings of non-target wildlife. APHIS, however, has not failed to reform its wildlife "management"

approaches for lack of effective and humane alternatives. Indeed, the Sacramento Bee series and a plethora of peer-reviewed scientific literature provide a collection of well-regarded alternatives that focus on coexisting with wildlife species and using nonlethal methods to address conflicts with carnivores.

69.     Wildlife Services continues to contract with other federal agencies, non-federal government agencies, and private land- and resource-owners, annually killing approximately 1.3 million native animals nationwide, primarily at the behest of private agricultural interests. In 2020, Wildlife Services reported that it killed 449 black bears, 703 bobcats, 62,701 adult coyotes, 2,752 foxes, 381 gray wolves, 5 Mexican gray wolves (a federally listed endangered species and subspecies of gray wolf), and 284 mountain lions, among many other species, and destroyed 252 coyote dens and 80 fox dens, killing an unknown number of pups. And with former employees alleging that Wildlife Services underreports the numbers of animals the agency kills, the actual death toll from Wildlife Services' activities may be much greater.

70.     Many of the species targeted by Wildlife Services play critical roles in their ecosystems—roles responsible for what scientists often refer to as "trophic cascades." Trophic cascades alter diverse processes including the dynamics of disease, wildfire, carbon sequestration, invasive species, and biogeochemical cycles (the cycling of compounds and elements that are essential for life, such as water, nitrogen, and phosphorus). Conversely, the loss of apex predators (at the top of the food chain) is well-documented to cause a wide range of unanticipated and often profound negative impacts that ripple through native ecosystems.

71.     Each year, Wildlife Services also unintentionally kills thousands of non-target animals, including companion animals and livestock. In 2020, Wildlife Services unintentionally killed approximately 2,700 non-target animals and birds nationally, including bears, bobcats,

ducks, eagles, foxes, herons, muskrats, otters, porcupines, raccoons, turkeys, and turtles. These killings undermine efforts to conserve and recover state and federally protected wildlife, which often need protection in part due to Wildlife Services' historic and ongoing practices.

72.     In addition to M-44 devices, many of the methods Wildlife Services uses—including snares, leg-hold and body-gripping traps, and gas cartridges—are fundamentally non-selective, environmentally destructive, inherently cruel, and often ineffective. For example, leg-hold traps are internationally recognized as inhumane and have been banned or restricted in many countries and parts of the United States. Upon being trapped, animals frantically struggle to free themselves by attempting to pull their trapped limb out of the device and chewing at the trap, or even chewing at their own limb. The force of a trap's jaws clamping down on an animal's limb and the subsequent struggle result in severe trauma, including mangling of the limb, fractures, damage to muscles and tendons, lacerations, injury to the face and mouth, broken teeth, loss of circulation, frostbite, and amputation. Wildlife Services routinely fails to check its traps, causing many animals to experience prolonged suffering and, in some cases, to eventually die of exposure.

**II.  Nevada-Wildlife Services' PDM Program and NEPA Analyses**

73.     In 2012, WildEarth Guardians brought suit against Wildlife Services in the U.S. District Court for the District of Nevada on the grounds that it failed to comply with NEPA and the Wilderness Act in relying on a woefully outdated 1994 Programmatic Environmental Impact Statement ("PEIS") and an inadequate 2011 Nevada EA/FONSI for its Nevada PDM program. *WildEarth Guardians v. U.S. Dep't of Agriculture, APHIS*, No. 2:12-cv-00716-MMD-PAL (filed April 30, 2012).

74.     In 2013, the district court granted in part and denied in part APHIS's motion to dismiss, which the Ninth Circuit Court of Appeals reversed. *WildEarth Guardians v. U.S. Dep't of Agriculture, APHIS*, 795 F.3d 1148 (9th Cir. 2015).

75.     The parties then agreed to a stipulated settlement in which APHIS would no longer rely on its outdated 1994 PEIS and would revise and redo all NEPA documents that had tiered to the 1994 PEIS, including a new NEPA analysis for the Nevada PDM program. APHIS additionally agreed to cease PDM activities in all Wilderness Areas and Wilderness Study Areas in Nevada, with the exception of responding to public health and/or safety emergencies, until a new NEPA analysis for that statewide PDM program was complete. *WildEarth Guardians v. U.S. Dep't of Agric., APHIS*, No. 2:12-cv-00716-MMD-PAL (ECF No. 67-1).

76.     In 2016, Wildlife Services initiated its public scoping process, soliciting public comment on the development of a new EA for its Nevada PDM program.

77.     In December 2016, Plaintiffs timely submitted scoping comments, expressing several concerns about the proposed Nevada PDM program that it requested Wildlife Services analyze and address by preparing a full EIS. Moreover, Plaintiffs identified the agency's obligations to: (1) accurately describe the baseline conditions of the areas to be affected by the proposed action, (2) fairly analyze an appropriate range of alternatives, (3) take a sufficiently hard look at the issues, (4) adequately consider the best available science, (5) adequately consider the impacts of cumulative and similar actions, and (6) adequately consider impacts to special areas containing unique resources and habitats.

78.     In November 2019, Wildlife Services issued a Draft EA inviting further public comments on the agency's analyses and proposed activities for its Nevada PDM program.

79.     Many of the 1,699 public comments on the agency's Draft EA—including those submitted by Plaintiffs—expressed serious concerns about NV-Wildlife Services' proposed PDM activities and the adequacy of its environmental analysis. Plaintiffs again requested that the agency prepare a full EIS given the potentially significant environmental impacts and controversy surrounding its Nevada PDM activities. Plaintiffs additionally alleged that the Draft EA failed to sufficiently address the points raised in their 2016 scoping comments with respect to Wildlife Services' legal obligations.

80.     Wildlife Services issued its Final 2020 Nevada PDM EA and associated DN/FONSI on July 15, 2020.

81.     The Final 2020 EA analyzed five alternatives in detail, including a "no action" alternative that would allow the agency to continue its existing Nevada PDM program without any modifications.

82.     In the DN/FONSI, Wildlife Services selected Alternative 2, which allows the agency to both continue its existing Nevada PDM program as well as expand it by recommencing lethal predator control in Wilderness areas and WSAs after the roughly 5-year settlement-driven ban on PDM in these specially designated areas. *See supra* ¶ 75.

83.     The Final 2020 EA proposed PDM activities across more than 6.2 million acres of Wilderness and Wilderness Study Areas in Nevada. The Final 2020 EA also states that there is an "extremely high" (95% - 100%) likelihood that lethal control of wildlife will be conducted in eight Wildernesses and five Wilderness Study Areas in Nevada over the next ten years based on a history of recurring conflicts and requests for Wildlife Services' PDM activities on the same federal grazing allotments.

84.     Though the Bureau's policy directives allow lethal wildlife control in Wilderness areas only where "necessary . . . to prevent serious losses of domestic livestock," neither the Final 2020 EA nor the Bureau's Minimum Requirements Decision Guide presents documented evidence that serious losses of livestock have occurred in the absence of lethal PDM in Nevada's Wildernesses, *e.g.*, during the several years that lethal PDM was prohibited in these areas pursuant to the aforementioned settlement agreement. Instead, the Minimum Requirements Decision Guide summarily concludes: "[wildlife damage management] to prevent serious losses of domestic livestock is a critical component in the continuation of livestock operations. Therefore, administrative action of [wildlife damage management] performed by WS-Nevada at the request of livestock agricultural producers is necessary in wilderness to prevent serious losses of the producers' livestock."

85.     The DN/FONSI allows NV-Wildlife Services to use the following lethal methods in Wilderness Areas: trapping, snaring, and ground shooting (including with the use of calling, tracking dogs, or decoy dogs). For Wilderness Study Areas, the DN/FONSI allows NV-Wildlife Services to use its full suite of both nonlethal and lethal PDM methods, including: distress sounds and alarm calls, visual scaring techniques, and aerial hazing, harassment, and dispersal; M-44 devices, large gas cartridges for killing target species in their dens and burrows; poisons, including chemically treated eggs; traps, foot and neck/body snares, calling to lure in target species and tracking with dogs/use of decoy dogs followed by ground shooting, including with lead ammunition; and aerial shooting, overflights, and landings.

86.     According to the Final 2020 EA, the majority of NV-Wildlife Services wildlife killing takes place on federal public lands at the request of private livestock producers (*e.g.*, stating over the last 5 years, 57.9% of NV-Wildlife Services' take of target predators and 69.3%

of responses to conflicts involving predator species has occurred on Forest Service and Bureau-managed lands).

87.     Coyotes are by far the most common target species killed by NV-Wildlife Services. In 2020, for example, NV-Wildlife Services killed 29 mountain lions, 1 bobcat, 2 black bears, 5 foxes, and 3,662 adult coyotes.

88.     Between 2015-2020, NV-Wildlife Services killed 14,855 coyotes on Bureau-managed lands alone. Among coyotes, badgers, bobcats, mountain lions, foxes, and black bears killed by NV-Wildlife Services in this five-year span on Bureau-managed lands, coyotes accounted for over 98% of the killing. NV-Wildlife Services' coyote killing on Bureau-managed lands was concentrated in four out of 17 counties it operated in, with 10,897 coyotes killed in White Pine, Eureka, Elko, and Humboldt counties. In other words, 73% of NV-Wildlife Services' coyote killing occurred in just four counties, although it operated in 17 counties.

89.     Between 2015-2020, NV-Wildlife Services killed 661 coyotes and eight mountain lions on Forest Service lands, meaning that 98.8% of NV-Wildlife Services killing operations on Forest Service lands targeted coyotes. Again, the killing was not evenly distributed, and was concentrated in only a few counties: 50.23% of coyote killing on Forest Service lands were in White Pine County, 29.9% in Lander, 19.2% in Elko, and 0.6% in Lyon.

90.     NV-Wildlife Services does not know how many coyotes inhabit the state of Nevada. NV-Wildlife Services has estimated that Nevada's coyote population is about 0.5 per square mile, or 54,913 coyotes. The Final 2020 EA explains that its analysis relies on this figure, 0.5 coyotes per square mile, from a U.S. Fish & Wildlife study on coyote abundance in Oregon in 1979, because "there is no Nevada-specific coyote density estimate in the literature" and Nevada Department of Wildlife "does not track or attempt to estimate coyote population levels."

91.     Further, the Final 2020 EA evaluates the impacts of NV-Wildlife Services' coyote killing at a statewide-scale, thus diluting the degree of localized effects to native ecosystems. The analysis area is 109,826 square miles—the entire land surface of Nevada; however, NV-Wildlife Services' intentional coyote killing is concentrated in only a few counties. Between 2015-2020, for example, 60% of NV-Wildlife Services' coyote killing occurred in Elko, Humboldt, and White Pine counties, a total area approximately 32% of Nevada's landmass. Further, localized impacts are exacerbated when non-Wildlife Services coyote killing is factored in. In Eureka County, for example, NV-Wildlife Services killed 3,106 coyotes over 2015-2020, which averages to 621.2 per year. The yearly average of non-Wildlife Services coyote take for 2012-2016 provided by the Final 2020 EA was 4,243 statewide, or 265 per county assuming arguendo that such take was evenly distributed. Adding NV-Wildlife Services' kills and non-Wildlife Services kills provides an average of 886 coyotes taken cumulatively per year in Eureka County. Eureka County is 4,176 square miles and thus, according to Wildlife Services' calculation (0.5 coyotes/square mile), has an estimated coyote population of 2,088. Thus, a rough estimate of average yearly cumulative take in Eureka County is over 42% of that local population, though the actual percentage could be even far higher if non-Wildlife Services killing is also concentrated in the same handful of counties. Yet, NV-Wildlife Services Final 2020 EA does not evaluate localized impacts of its lethal management activities.

92.     Between 2015-2020, NV-Wildlife Services also unintentionally caught 74 animals. Among these were 36 bobcats, 11 of which were killed; four black bears, all of which were killed; and one mountain lion, which was killed.

//

///

**III. The 2021 Annual Work Plans**

93.     As the Final 2020 EA acknowledged, the relevant land management agency, here either the Bureau or Forest Service, must approve of the "final selection" of PDM methods to be used on federal public lands, including in Wilderness Areas and Wilderness Study Areas. This is accomplished through the Annual Work Plan process. Accordingly, NV-Wildlife Services annually coordinates with the Bureau and Forest Service to develop Annual Work Plans, which document the types of operations and restrictions identified by the land management agencies for managing the public lands under their jurisdictions in the State of Nevada. Thus, Annual Work Plans govern how those lands are managed for the upcoming year.

94.     Currently, NV-Wildlife Services has signed a 2021 Annual Work Plan with the Forest Service for the Humboldt-Toiyabe National Forest and with the Bureau for eight Bureau Districts that are wholly or partially within Nevada (Battle Mountain, Carson City, Elko, Ely, Northern California, Southern Nevada, Twin Falls (ID), and Winnemucca).

95.     The 2021 Annual Work Plan between NV-Wildlife Services and the Forest Service authorizes Wildlife Services to conduct PDM activities on the following Wilderness Areas and Wilderness Study Areas on the Humboldt-Toiyabe National Forest:

- Mt. Rose Wilderness (31,183 acres)

- Currant Mountain Wilderness (47,311 acres)

- East Humboldt Wilderness (32,364 acres)

- Grant Range Wilderness (52,451 acres)

- The Forest Service-administered portion of Mt. Moriah Wilderness (83,711 acres)

- Quinn Canyon Wilderness (26,310 acres)

- Ruby Mountains Wilderness (92,652 acres)

-       High Schells Wilderness (121,499 acres)

-       The Forest Service-administered portion of Antelope Range WSA (43,700 acres)

96.     The 2021 Annual Work Plan between NV-Wildlife Services and the Forest Service, however, stipulates that Wildlife Services must first obtain approval from both the Regional Forester and the specific National Forest's Supervisor, on a case-by-case basis, prior to operating in Forest Service-administered Wilderness Areas.

97.     The 2021 Nevada BLM Annual Work Plan authorizes PDM activities on the following ten Wilderness Areas and 14 Wilderness Study Areas on Bureau-managed lands that are wholly or partially within Nevada:

Wilderness Areas Administered by the Bureau's Ely District Office:

-       Becky Peak Wilderness (18,189 acres)

-       Bristlecone Wilderness (14,095 acres)

-       Far South Egans Wilderness (36,299 acres)

-       Goshute Canyon Wilderness (42,544 acres)

-       Government Peak Wilderness (6,313 acres)

-       Highland Ridge Wilderness (68,623 acres)

-       Mt. Irish Wilderness (28,274 acres)

-       The BLM-administered portion of the Mt. Moriah Wilderness (8,708 acres)

-       South Egan Range Wilderness (67,214 acres)

-       Worthington Mountains Wilderness (30,594 acres)

Wilderness Study Areas Administered by the BLM Battle Mountain District Office:

-       The Bureau-administered portion of the Antelope Range WSA (43,700 acres)

Wilderness Study Areas Administered by the Bureau's Carson City District Office:

-        Burbank Canyons WSA (13,395 acres)

-        Gabbs Valley Range WSA (81,811 acres)

Wilderness Study Areas Administered by the Bureau's Elko District Office:

-        Bluebell WSA (55,665 acres)

-        Cedar Ridge WSA (10,009 acres)

-        Goshute Peak WSA (69,770 acres)

-        Red Spring WSA (7,847 acres)

Wilderness Study Areas Administered by the Bureau's Ely District Office:

-        Goshute Canyon WSA (22,225 acres)

Wilderness Study Areas Administered by the Bureau's Winnemucca District Office:

-        Fox Range WSA (75,404 acres)

-        Mt. Limbo WSA (23,752 acres)

-        Poodle Mountain WSA (142,050 acres)

-        Selenite Mountains WSA (32,041 acres)

Wilderness Study Areas Jointly Administered by the Bureau's Battle Mountain and Ely District

Offices:

-        Park Range WSA (47,268 acres)

Wilderness Study Areas Jointly Administered by the Bureau's Battle Mountain, Carson City, and

Winnemucca District Offices:

-        Augusta Mountains WSA (89,372 acres)

98.      The Bureau's policy directives instruct that "[a]nimal damage control in

designated wilderness areas must be approved by the State Director on a case-by-case basis[,]"

and that "direct control" in Wilderness Areas should be limited to the "individual animals

causing the problem" and that "only the minimum amount of control necessary to solve the problem" should be used. BLM Manual 6830. Additionally, the governing Wilderness Management Plan for the Highland Ridge, South Egan Range, and Far South Egans Wildernesses—areas where the 2021 Nevada BLM Annual Work Plan authorizes PDM activities—requires that wildlife damage management activities to "prevent considerable loss of livestock" be limited to "the minimum amount of control necessary to resolve wildlife damage problems." WMP, Highland Ridge, Mount Grafton, South Egan Range & Far South Egans Wilderness Nevada (2013). Wilderness Management Plans governing several other Bureau-managed Wildernesses where the 2021 Nevada BLM Annual Work Plan authorizes PDM activities require that "proposed wildlife [management] actions . . . be determined necessary to protect or preserve wilderness character," in order to be "authorized" in Wilderness Areas. Bristlecone and Goshute Canyon Wilderness Final WMP (2014); Becky Peak and Government Peak Wilderness Final WMP (2014).

99.    Contrary to its own official policy directives and WMP directives, and in contrast to the Forest Service's protocol of requiring its approval for Wildlife Services' PDM activities in Wilderness Areas on an individual, case-by-case basis, the 2021 Nevada BLM Annual Work Plan authorizes Wildlife Services to conduct lethal PDM in Bureau-managed Wilderness Areas, by use of any of the aforementioned methods in ¶ 85 as Wildlife Services deems appropriate in response to any given request from a private livestock producer. Thus, the Bureau does not review the circumstances surrounding individual requests for Wildlife Services' PDM activities in Bureau-managed Wildernesses (or Wilderness Study Areas) in order to determine, on a case-by-case basis, whether lethal PDM is "necessary to prevent serious losses of domestic livestock" nor to ensure "only the minimum amount of control necessary to solve the problem" will be

used. Instead, the Bureau delegates this case-by-case decision-making process to Wildlife Services' personnel. Under the 2021 Nevada BLM Annual Work Plan, Wildlife Services must simply provide email notification to the Bureau before and after conducting PDM in Bureau-managed Wildernesses and Wilderness Study Areas.

100.    The Bureau's own documentation acknowledges that conflicts between wildlife and livestock (*e.g.*, depredation by predators) often recur in the same areas and during the same time periods, which typically coincide with both the grazing of newly born lambs and calves in remote areas on public lands like Wildernesses and Wilderness Study Areas, and the period when native carnivores are rearing their offspring. Though the Bureau recognizes that these spatial-temporal factors greatly increase the risk of predation, it does not require grazing permit holders to adjust their grazing practices on Bureau-managed lands (*e.g.*, season of use, class of livestock), including within Wildernesses and Wilderness Study Areas, to proactively reduce this risk.

101.    Likewise, nor does the Bureau require grazing permit holders to employ other nonlethal strategies to reduce the risk of wildlife-livestock conflicts (*e.g.*, maintaining a regular human presence with their livestock herds, actively keeping sheep and cattle bunched up in open defensible spaces) before authorizing Wildlife Services to conduct lethal PDM on any Bureau-managed lands through its Annual Work Plans.

102.    Though Wildlife Services alleges that livestock producers generally employ nonlethal methods before requesting Wildlife Services conduct lethal PDM activities on their behalf, neither Wildlife Services nor the Bureau document which, if any, nonlethal methods livestock producers unsuccessfully attempted.

103.    Nor do the Defendant agencies require that the livestock producers themselves document what strategies they used, if any, or the apparent effectiveness of any such strategy. Typically, Wildlife Services relies on the livestock producers to monitor and evaluate the effectiveness of its PDM strategies but does not require them to report back.

104.    Consequently, Wildlife Services and the Bureau lack actual evidence and analysis showing lethal control of native wildlife is "necessary" for grazing operations to continue on these federal public lands, including designated Wildernesses, because modifying grazing practices and/or employing nonlethal strategies have proven to be ineffective.

## FIRST CLAIM FOR RELIEF

### Wildlife Services Failed to Prepare an EIS as Required by NEPA

105.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

106.    This First Claim for Relief challenges Wildlife Services' violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370, and NEPA's implementing regulations, by refusing to prepare a full NEPA-compliant EIS for its PDM program in Nevada, in light of information showing its activities may have a significant adverse effect on the human environment. This claim is brought pursuant to the judicial review provision of the APA, 5 U.S.C. § 706(2).

107.    Determining whether an action may significantly impact the environment requires the agency to consider both the context and intensity of the action. 40 C.F.R. § 1508.27.

108.    NV-Wildlife Services' PDM program in Nevada may have a significant impact on the human environment for reasons including but not limited to the following:

a.    The analysis area for NV-Wildlife Services' PDM activities spans the entire State of Nevada;

b.      Wildlife Services' PDM activities affect unique and ecologically critical

geographic areas because they are projected to affect over 6.2 million acres across

18 congressionally designated Wildernesses and 15 Wilderness Study Areas, as

well as other specially designated and ecologically important places;

c.      Wildlife Services' PDM activities, particularly the widespread use of

indiscriminate killing methods like M-44s, as well as the use of lead ammunition,

threaten public health and safety;

d.      Wildlife Services' PDM activities are highly controversial and involve

highly uncertain and unknown risks, particularly surrounding both the efficacy of

killing native carnivores to prevent future livestock depredations and cascading

negative ecological consequences;

e.      Wildlife Services' PDM activities threaten cumulatively significant

environmental effects, particularly when combined with other activities that result

in the lethal removal of native wildlife and adverse impacts to their habitats;

f.      Wildlife Services' activities under the Final 2020 EA and DN/FONSI

threaten violations of other federal laws, such as the National Forest Management

Act, the Federal Land Policy and Management Act, and the Wilderness Act, in part

because the Defendant agencies have failed to establish that Wildlife Services'

PDM activities are consistent with governing land management plans, including

applicable Wilderness Management Plans, and that lethal PDM activities are

necessary for carrying out livestock grazing in designated Wilderness areas;

109.    These factors, individually and cumulatively, demonstrate that Wildlife

Services' PDM activities approved under the Final 2020 EA and DN/FONSI constitute a

COMPLAINT - 37

major federal action that poses significant impacts on the environment, and thus Wildlife

Services' decision not to prepare an EIS was arbitrary, capricious, an abuse of discretion,

and not in accordance with law.

<b>SECOND CLAIM FOR RELIEF</b>

<b>Wildlife Services failed to take the requisite "hard look" under NEPA</b>

110.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

111.    This Second Claim for Relief challenges Wildlife Services' violations of the

National Environmental Policy Act, 42 U.S.C. §§ 4321-4370, and NEPA's implementing

regulations, in failing to undertake a thorough and objective "hard look" at the environmental

impacts of its activities proposed in the Final 2020 EA and DN/FONSI. This claim is brought

pursuant to the judicial review provision of the APA, 5 U.S.C. § 706(2).

112.    NEPA requires all federal agencies to undertake a thorough and public analysis of

the environmental consequences of proposed federal actions, including a rigorous and objective

analysis of reasonable alternative actions; quantified and detailed information, including a

description of baseline conditions; and a thorough evaluation of the direct, indirect, and

cumulative impacts of proposed actions.

113.    The 2020 Nevada PDM EA and DN/FONSI violate NEPA's "hard look"

requirement and the APA in multiple respects, including but not limited to: failing to include

quantified and detailed information, such as adequate baseline information that contains reliable

predator population estimates and reliable annual maximum sustainable harvest levels; failing to

adequately describe and objectively explore reasonable alternatives designed to mitigate wildlife-

livestock conflicts through science-backed nonlethal strategies; failing to ensure Wildlife

Services' proposed activities are consistent with all governing federal land management plans;

COMPLAINT - 38

and by otherwise failing to take the requisite "hard look" at the direct, indirect, and cumulative impacts of its proposed actions and alternatives.

114.    For the foregoing reasons, Wildlife Services' failure to comply with NEPA's hard look requirement is arbitrary, capricious, an abuse of discretion, and not in accordance with the law under NEPA and the APA. 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

### NEPA Violations: Annual Work Plans

115.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

116.    This Third Claim for Relief challenges Defendants Wildlife Services, Forest Service, and the Bureau's violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370, and NEPA's implementing regulations, by using Annual Work Plans to authorize PDM actions on federal lands in Nevada without conducting the necessary site-specific NEPA analysis to assess the effects of such actions occurring on those lands.

117.    NEPA requires agencies to assess proposed actions on a "site specific" basis for compliance with their land use plans and governing land use statutes. *See Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 934 (9th Cir. 2010). It also requires agencies to examine the effects of proposed actions on the site where they will be conducted. *See id.*

118.    Defendants Wildlife Services, Forest Service, and the Bureau are violating NEPA by authorizing wildlife killing on the Humboldt-Toiyabe National Forest and 8 BLM Districts in Nevada through Annual Work Plans without conducting any site-specific NEPA analysis that analyzes the direct, indirect, and cumulative environmental impacts of the activities authorized by those plans, or assessing whether the activities authorized comply with federal land use plans and other federal laws. By failing to conduct such analysis, Defendants Wildlife Services, Forest

Service, and the Bureau do not provide for any public disclosure and comment on those

activities, also in violation of NEPA.

119.    Because Defendants Wildlife Services, Forest Service, and the Bureau have never

adequately disclosed or analyzed site-specific environmental impacts and alternatives under

NEPA for Wildlife Services' activities on the affected federal lands, the Annual Work Plans

between Wildlife Services and the Forest Service and the Bureau are arbitrary and capricious, an

abuse of discretion, and not in accordance with law under NEPA and the APA. 5 U.S.C. §

706(2)(A).

## FOURTH CLAIM FOR RELIEF

### Wilderness Act Violations

120.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

121.    The Wilderness Act prohibits any commercial enterprise, 16 U.S.C. § 1133(c),

except as "specifically provided for" in the Act's list of exceptions. *Id*. § 1133(d)(1)-(4). A

"commercial enterprise" is a "project or undertaking of or relating to commerce" with a

primarily commercial purpose and effect. *Wilderness Soc'y*, 353 F.3d at 1061, 1063. The Act

makes an exception for commercial services only "to the extent necessary for activities which are

proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. §

1133(d)(5). Thus, even when commercial activities serve a valid "recreational" or "wilderness

purpose," the agency must still make a requisite "finding of 'necessity' before authorizing

commercial services in wilderness areas." *High Sierra Hikers Ass'n. v. Blackwell*, 390 F.3d 630,

646 (9th Cir. 2004). Moreover, "a *generic* finding of necessity does not suffice." *Wilderness

Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1037 (9th Cir. 2010) (citing *High

Sierra,* 390 F.3d at 647).

122.     Wildlife Services' lethal PDM activities within designated Wildernesses, *e.g.*, killing native wildlife within Wilderness Areas solely at the request of private livestock producers for the alleged purpose of preventing future losses of commercial livestock is a "commercial enterprise" within the meaning of the statute. *Wilderness Soc'y*, 353 F.3d at 1061, 1063. Lethal PDM activities are not among the Act's specific exceptions to its prohibition on "commercial enterprise" within Wilderness Areas. 16 U.S.C. § 1133(d)(1)-(4). Nor do Wildlife Services' lethal PDM activities serve to realize the Act's "wilderness purposes" of any designated Wilderness Areas. *Id*. § 1133(d)(5). Such activities only serve to protect private commercial livestock grazing interests as opposed to furthering wilderness interests or national wilderness policy.

123.     Defendants Wildlife Services and the Bureau have violated the Wilderness Act by: (1) authorizing an impermissible commercial enterprise within designated Wilderness areas; and (2) authorizing activities that offend the Act's mandate to preserve the natural conditions that are a part of the designated Wilderness Areas' wilderness character—the Act's ultimate goal. 16 U.S.C. § 1131(a), 1133(b).

124.     The Final 2020 EA acknowledges that lethal removal of predators from Wilderness Areas for the alleged purpose of "preventing serious losses of domestic livestock" admittedly impairs several qualities that make up wilderness character—*i.e.*, that Wildernesses are untrammeled, natural, and provide opportunities for primitive and unconfined recreation—in the following ways: (1) "[t]he removal of a predator from its native habitat is a trammeling action that may manipulate the natural ecosystem within wilderness"; (2) lethal predator removal for "administrative purposes" (as opposed to recreational hunting) impairs "the natural quality of wilderness character" because the resulting "effects on the ecosystem and environment" create

an "ecological system [not] entirely free from the effects of modern civilization"; and (3) predator removal may "impact opportunities for primitive and unconfined recreation . . . which includes a sense of traveling through a landscape where predators are present." Additionally, the Bureau's Minimum Resources Decision Guide acknowledges that the following authorized PDM activities admittedly impair these same wilderness qualities: ground shooting, calling, trapping, snaring, and use of trained tracking dogs. In fact, although the Bureau's documentation lists many activities, not a single activity out of the 20 considered has a "positive" effect on wilderness character. Nevertheless, the Bureau authorized Wildlife Services to lethally remove an unknown number of wild animals from their native habitats, diminishing the natural and untrammeled qualities present in these Wilderness Areas, for the perceived purpose of preventing losses of commercial livestock by shooting, calling, trapping, snaring, and tracking with trained dogs in violation of the Act's mandate that Wilderness Areas be administered "in such a manner . . . so as to provide for . . . the preservation of [each area's] wilderness character[.]" 16 U.S.C. § 1131(a), 1133(b).

125.    Alternatively, to the extent the Wilderness Act's specific exception for the continuation of pre-existing livestock grazing, 16 U.S.C. § 1133(d)(4), and/or the summary statement in the Congressional Grazing Guidelines, can be read to "implicitly" include the killing of native wildlife where purportedly "necessary" to protect commercial livestock grazing operations in designated Wilderness Areas, Defendants Wildlife Services and the Bureau have failed to make the requisite "necessity" finding here. *See e.g.*, *Wilderness Watch, Inc.*, 629 F.3d at 1037; BLM Manual 6830.

126.    For instance, the agencies' own documentation acknowledges that the risk of predation is highest with grazing vulnerably young lambs and calves and when livestock are left

unattended in remote areas. The agencies' own documentation also further indicates that the risk

of predation to livestock can be effectively reduced by nonlethal strategies aimed at modifying

livestock grazing practices and animal husbandry techniques in order to avoid wildlife-livestock

conflicts in the first place. Yet, there is no documentation to show that these other strategies that

could admittedly meet the goal of protecting commercial livestock in Wilderness Areas were

first employed and found insufficient before the Defendant agencies authorized Wildlife

Services' lethal PDM activities in the designated Wildernesses. Further, the agencies' own

documentation states that wildlife-livestock conflicts often recur in the same locations during the

same time periods, casting doubt on the effectiveness of Wildlife Services' lethal PDM strategies

to prevent future losses of commercial livestock. Nor do the Defendant agencies present

evidence that serious losses of domestic livestock occurred in the absence of Wildlife Services'

PDM activities in Wilderness Areas, such as during the several years that lethal PDM activities

were prohibited per the aforementioned legal settlement. In short, the agencies have failed to

adequately demonstrate that NV-Wildlife Services' lethal PDM activities are "necessary" at

all—let alone that the 2021 Nevada BLM Annual Work Plan limits lethal control to the

minimum amount necessary for preventing serious losses of domestic livestock in the designated

Wildernesses.

127.    For the foregoing reasons, Wildlife Services' Final 2020 EA and DN/FONSI, the

2021 Nevada BLM Annual Work Plan, and the Bureau's Minimum Resources Decision Guide

and Decision Record/FONSI are arbitrary and capricious, an abuse of discretion, and not in

accordance with law under the Wilderness Act and the APA. 5 U.S.C. § 706(2)(A).

128.    Further, Wildlife Services and the Bureau also acted arbitrarily, capriciously and

not in accordance with Nevada's Wilderness enabling statutes, and in excess of their statutory

authority thereunder, by authorizing lethal predator control activities in Bureau-managed Wilderness Areas that exceed the scope of permissible wildlife management activities under the Lincoln and White Pine County Conservation Acts. Such predator control activities are neither limited to, nor necessary for, "maintain[ing] or restor[ing] fish and wildlife populations and habitats." The Defendant agencies have also failed to adequately demonstrate that such activities are consistent with relevant wilderness management plans and policies aimed at promoting "healthy, viable, and more naturally distributed wildlife populations," within the applicable Wilderness Areas, as required by both statutes. White Pine County Conservation Act, Pub. L. No. 108-424, § 324(b); Lincoln County Conservation Act, Pub. L. No. 109-432 § 204(b); 5 U.S.C. § 706(2)(A), § 706(2)(C).

### FIFTH CLAIM FOR RELIEF

#### Wildlife Services' Expanded Predator Killing is *Ultra Vires*

129.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

130.     This Fifth Claim for Relief challenges Wildlife Services' expanded Nevada predator killing as *ultra vires* and beyond the authority delegated by the Animal Damage Control Act, as amended. 7 U.S.C. § 426(a)-(d). This Fifth Claim is brought pursuant to the APA, 5 U.S.C. § 706(2)(C).

131.     Under the Animal Damage Control Act , as amended, Congress delegated to the Secretary of Agriculture the authority to "conduct a program of wildlife services with respect to *injurious* animal species." 7 U.S.C. § 426(a) (emphasis added).

132.     Wildlife Services lacks the authority to act unless and until Congress confers the power upon it to do so. The Animal Damage Control Act does not grant Wildlife Services the authority to kill ravens, coyotes, and other native predators, altering native ecosystem functions

and predator-prey relationships to ostensibly protect native "prey" or "game" species, without establishing that such native predators are "injurious" to the populations of wildlife to allegedly be benefitted.

133.     In its 2020 Nevada PDM EA and DN/FONSI, NV-Wildlife Services does not adequately establish that native predators like ravens and coyotes, which have coevolved alongside native ungulates and sage grouse, are "injurious" to those wild "game" or sage grouse populations. The Final 2020 EA relies on outdated, inconclusive, and contrary scientific literature to support its conclusions that killing native predators will benefit populations of wild "game" or sage grouse.

134.     Accordingly, Wildlife Services' approval, in the 2020 Nevada PDM EA and DN/FONSI, of new and continuing wildlife killing activities at the request of the Nevada Department of Wildlife and other entities to supposedly benefit or otherwise aid other native wildlife populations exceeds the limited power conferred upon the agency by Congress through the Animal Damage Control Act, and is, therefore, *ultra vires*.

135.     Pursuant to the APA, this Court must reverse and set aside agency action that, as here, is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs WildEarth Guardians and Western Watersheds Project request that this Court enter judgment providing the following relief:

A. Declare that Defendant Wildlife Services has violated and is violating NEPA, 42 U.S.C. § 4321 *et seq.*, and the implementing CEQ regulations, 40 C.F.R. §§ 1500-1508, by failing to prepare an EIS for its Nevada PDM activities;

B. Order Wildlife Services to complete the EIS required by NEPA, 42 U.S.C. § 4321 *et seq.*, by a reasonable date certain;

C. Declare that Wildlife Services has violated and is violating NEPA, 42 U.S.C. § 4321 *et seq.*, and the implementing CEQ regulations, 40 C.F.R. §§ 1500-1508, by failing to take a "hard look" at actions, alternatives, and environmental consequences;

D. Declare that Defendants Wildlife Services, Forest Service and the Bureau's Annual Work Plans violate NEPA and the APA, and reverse and set aside the Annual Work Plans;

E. Declare that Defendants Wildlife Services and the Bureau's Annual Work Plans violate the Wilderness Act, 16 U.S.C. § 1131 *et seq.*, and/or the Lincoln and White Pine County Conservation Acts;

F. Declare that Wildlife Services' killing of other natural and native predators of "game" species and other native wildlife like sage grouse are *ultra vires* and beyond the authority delegated by the Animal Damage Control Act, as amended;

G. Vacate Wildlife Services' 2020 DN/FONSI and Annual Work Plans with the Bureau and Forest Service and enjoin Wildlife Services and its agents from implementing the challenged Nevada PDM activities on the affected federal public lands unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

H. Award Plaintiffs their costs, attorneys' fees, and other expenses in this action pursuant to EAJA, 28 U.S.C. § 2412; and

I. Grant such other and further relief as this Court deems just and proper.


Respectfully submitted this 9th day of December, 2021.

NV Bar #11533

Cavanaugh-Bill Law Offices, LLC

COMPLAINT - 46

401 Railroad Street, Suite 307
Elko, NV 89801
Tel: (775) 753-4357
Fax: (775) 753-4360
julie@cblawoffices.org

*/s/ Jennifer Schwartz*   * Pro hac
Jennifer R. Schwartz   Vice to be filed
WildEarth Guardians
P.O. Box 13086
Portland, OR 97213
(503) 780-8281
jschwartz@wildearthguardians.org

*Of Counsel for Plaintiffs*

COMPLAINT - 47