1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

DISTRICT OF NEVADA

8

* * *

9

WILDEARTH GUARDIANS and
WESTERN WATERSHEDS PROJECT,

Case No. 3:21-cv-00508-LRH-CLB

10

Plaintiffs,

ORDER

11

v.

12

U.S. DEPARTMENT OF AGRICULTURE
ANIMAL AND PLANT HEALTH
INSPECTION SERVICES-WILDLIFE
SERVICES, U.S. FOREST SERVICE, and
BUREAU OF LAND MANAGEMENT,

13
14
15

Defendants.

16
17

Before the Court are Plaintiffs WildEarth Guardians and Western Watersheds Project's

18

(Plaintiffs) motion for summary judgment (ECF No. 25), Defendants Wildlife Services, U.S.

19

Forest Service, and Bureau of Land Management's (collectively Wildlife Services) cross-motion

20

for summary judgment (ECF No. 33), and Plaintiffs' motion to consider an extra-record

21

declaration (ECF No. 26).  As explained below, the Court denies Plaintiffs' motion for summary

22

judgment and motion to consider an extra-record declaration, and grants Wildlife Services' cross-

23

motion for summary judgment.

24

**I.      BACKGROUND**

25

Wildlife Services is a federal program that helps resolve conflicts that arise between

26

humans and wildlife throughout the state of Nevada.  For over eighty years, the Nevada branch of

27

Wildlife Services has employed predator damage management (PDM) to resolve threats to public

28

health and safety, prevent damage to private property, and prevent the loss of livestock or natural

1

resources.  WS017062; WS017064; WS017070.  Wildlife Services acts only upon the request for assistance from "government, tribal, commercial, organizational, or private" entities.[1]  WS017063.

For several years, Wildlife Services responded to requests for assistance in wilderness and wilderness study areas only if the requests were to protect human health and safety.  WS0005–06; WS017214.  There is, however, a continuing need to respond to other requests as Wildlife Services did in the past because some portions of the wilderness areas in Nevada have historic grazing allotments.  WS017074–75; WS017731.  This led Wildlife Services, and cooperating agencies such as the Bureau of Land Management (BLM) and the Forest Service, to prepare a new environmental assessment (EA) to consider alternatives to its then current approach.  WS017731.

The proposed EA was subjected to extensive public comment, revised, and then issued in final version in July 2020.  WS017042–730.  In the EA, Wildlife Services thoroughly reviewed five alternative approaches to PDM in Nevada.  One of the proposed alternatives included responding to requests for assistance in wilderness and wilderness study areas by using a limited set of PDM methods as Wildlife Services had done in the past.  WS017734.  Wildlife Services ultimately adopted this alternative, finding that it would not have a significant impact on the environment.  WS017748.

## II.    LEGAL STANDARD

The Administrative Procedure Act governs judicial review of alleged violations of the National Environmental Policy Act (NEPA), *Or. Nat'l Res. Council Fund v. Brong*, 492 F.3d 1120, 1124–25 (9th Cir. 2007), and requires a court to "hold unlawful and set aside agency action" if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001).  An agency's action is considered "arbitrary and capricious" when

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or

---

[1]    After receiving and reviewing a request for assistance, Wildlife Services provides either technical or direct assistance to resolve the conflict.  WS017077.  Technical assistance includes recommendations to manage conflict whereas direct assistance involves both non-lethal and lethal management techniques.  WS017120–21; WS017603–08; WS017612–16; WS017624–31.

is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*350 Mont. v. Haaland*, 29 F.4th 1158, 1168 (9th Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  When reviewing agency action under this standard, a court "may not substitute [its] judgment for that of the agency," and must limit its review to "the grounds that the agency invoked when it took the action."  *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 33 F.4th 1202, 1216 (9th Cir. 2022) (internal quotations omitted).  "This standard is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks omitted).

## III.   DISCUSSION

Plaintiffs contend that Wildlife Services (1) violated NEPA; (2) violated the Wilderness Act and related Nevada statutes; and (3) exceeded their statutory authority.  As explained below, these arguments do not have merit.

### A.   Wildlife Services prepared an EA authorizing PDM throughout Nevada that satisfies NEPA.

Plaintiffs first argue that Wildlife Services violated NEPA.  NEPA is a procedural statute that requires "federal agencies to consider the environmental impact of any major federal action."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 89 (1983).  "NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Generally, NEPA's process requires an agency to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment" to ensure that that the agency took a "hard look" at the environmental impacts of its action and to ensure that the public played a role in the decision-making process and the implementation of the decision.   42 U.S.C. § 4332(C); *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 924 (9th Cir. 2015); *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 730.

"If an agency is unsure whether its proposed action will have significant environmental impacts, it may first prepare an EA.  An EA is a 'concise, public document' providing 'sufficient

evidence and analysis' for the agency to determine 'whether to prepare an environmental impact statement.'" *Environmental Def. Ctr. v. Bureau of Ocean Energy Management*, 36 F.4th 850, 872 (9th Cir. 2022) (quoting 40 C.F.R. § 1508.9(a)(1)).  An EA does not substitute or replace an EIS; it helps determine if an EIS is warranted.  *Id.*  If an agency prepares an EA and determines that the proposed action will not have significant environmental effects, the agency can issue a finding of no significant impact, which ends the NEPA process.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238–39 (9th Cir. 2005).

Here, Plaintiffs argue that Wildlife Services violated NEPA because (1) a state-level analysis of the effects of PDM was insufficient to satisfy NEPA requirements; (2) PDM will have a significant impact on the environment, thus requiring the creation of an EIS before it is authorized; and (3) BLM and the Forest Service needed to prepare new NEPA analyses to authorize PDM through annual work plans (AWPs).

### 1.   Wildlife Services reasonably conducted a state-level analysis and was not required to conduct a site-specific analysis.

"[A]n agency has the discretion to determine the physical scope used for measuring environmental impacts." *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).  The agency's choice must be a reasoned decision and cannot be arbitrary.  *Idaho Sporting Congress*, 305 F.3d at 973.  Here, Wildlife Services determined that a statewide analysis was appropriate for measuring the environmental impacts that PDM would have in Nevada.  When possible, Wildlife Services used site-specific data to analyze the effects of PDM.  As the EA demonstrates, this was a reasoned decision and was not arbitrary for several reasons.

First, Wildlife Services operates its PDM activities throughout the entire state of Nevada. WS017043; WS017095.  At any given time, Wildlife Services may be called upon to assist with predator management in any part of the state.  WS017094–95.  A statewide analysis allowed Wildlife Services to create an exhaustive analysis that could "apply to any action that may occur in any locale and at any time."  WS017095.  It also "provide[d] a more comprehensive and less redundant analysis" than smaller EAs would have and allowed for "the effective analysis of

4

potential cumulative impacts." WS017095. Further, it allowed for the use of "data and reports from state and federal wildlife management agencies, which are typically on a state-wide basis." *Id.* The scope of the EA and the ultimate decision to conduct a statewide analysis was well-considered and reasonable.

Second, Wildlife Services reached reasonable conclusions based on the best data and peer-reviewed literature available. *See* WS017101–02; WS017582. For example, Wildlife Services determined that estimating the statewide population of coyotes and other species was appropriate and that there would not be a significant impact on their populations. Plaintiffs argue that this decision was arbitrary because Wildlife Services should have generated site-specific data for the species. The EA and available data, however, undermine this argument. The nationwide coyote population has increased in abundance and its distribution has grown wider over the past several decades. WS017305. In Nevada specifically, the coyote population is very healthy and has led Nevada to classify coyotes as an unprotected mammal, allowing them to be taken year-round without a license. WS017305–06. As a result of this classification, Nevada does not track or attempt to estimate coyote populations or densities. *Id.*

Given the lack of Nevada specific data, Wildlife Services conducted a coyote population impact analysis based on the peer-reviewed literature. WS017306–10. In doing so, Wildlife Services utilized a conservative estimate of nearly 55,000 coyotes in Nevada. *Id.* This population estimate and the subsequent analysis demonstrated that the cumulative take of coyotes would be 25%, a number well below the sustainable harvest level of 60%. WS017307–09. The stable population trend for coyotes in Nevada and the fact that the cumulative take would be below the sustainable harvest level led Wildlife Services to conclude that cumulative impacts on the coyote population have not and will not adversely impact the coyote population. WS017310. The Court holds that this conclusion was well reasoned and was not arbitrary. The site-specific data that Plaintiffs contend Wildlife Services should have used does not exist and Wildlife Services was not required to create it.

Third, Wildlife Services' use of a statewide analysis was not an attempt to dilute the effects of PDM. Although the PDM activities are not evenly distributed throughout Nevada, this case

differs from cases in which the challenged activity was heavily concentrated in certain areas. For example, a court faulted Wildlife Services-Idaho for relying on statewide analysis when its activities occurred in only 11.6% of the state. *W. Watersheds Project v. USDA APHIS Wildlife Services*, 320 F. Supp. 3d 1137, 1147 (D. Idaho 2018). Here, however, Wildlife Services operates its PDM activities throughout the entire state of Nevada. And they are not heavily concentrated in any area to the extent that it would have a significant adverse effect on the wildlife population in that area. WS017582; WS017300–97. Thus, Wildlife Services' use of a statewide analysis was not an attempt to dilute the effects of PDM but rather reasonably reflected the scope of the activities that the EA was analyzing.

### 2. Wildlife Services reasonably concluded that PDM would not have a significant impact on the environment and that preparation of an EIS was not needed.

Under NEPA, the significance of the impact a proposed action will have on the environment depends on both the context and intensity of the action. 40 C.F.R. § 1508.27. "Intensity" refers to the severity of the impact and is determined by considering a set of enumerated factors, including whether (1) the action is highly controversial; (2) the effects of the action are highly uncertain; (3) individually insignificant effects are cumulatively significant; (3) the action will affect public health or safety; and (4) the action is located in proximity to ecologically critical areas. *Id.* at 1508.27(b). After considering each of these factors, Wildlife Services determined that the proposed alternative of performing PDM throughout Nevada would not have a significant impact on the environment. As explained below, this conclusion was well-reasoned and was not arbitrary.

#### i. PDM is not highly controversial and does not have highly uncertain effects.

Plaintiffs contend that Wildlife Services should have prepared an EIS because PDM is highly controversial and has highly uncertain effects. Wildlife Services disputes this by arguing that, although some members of the public opposed PDM and believe it is not effective, science and its decades of experience demonstrate that PDM is well-understood and is effective at resolving human-wildlife conflict.

As the Ninth Circuit has explained, an action is "highly controversial" only when a substantial dispute exists to the size, nature, or effect of the major federal action. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010). A substantial dispute exists when evidence casts a serious doubt upon the reasonableness of an agency's conclusions. *Id.* (citing *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001)). Typically, a proposed action is "highly uncertain" where the government employs new techniques, the techniques are unique to the region, or they are experimental such that the results are unpredictable. *Conservation Congress v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189, 1204 (E.D. Cal. 2017); *National Parks Conservation Association v. Semonite*, 311 F. Supp. 3d 350, 369 (D.D.C. 2018). The mere existence of opposition to an action is not enough to render the effects of an action "highly controversial" or "highly uncertain." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005). A challenger must do more than "cherry pick information and data out of the administrative record to support its position" that an action is "highly" controversial or uncertain. *Id.*

Here, Plaintiffs have failed to meet their burden to demonstrate that there is a substantial dispute as to the size, nature, or effect of Wildlife Services' decision to utilize PDM. The EA acknowledged that there are opposing views to the use of PDM. Because there were opposing views, the EA contained an extensive review of scientific articles which doubt the efficacy of lethal PDM and its impact on predator populations. After considering those articles, as well as scholarship from other leading scholars, its own history of using PDM, and other evidence, Wildlife Services concluded that there is not a substantial dispute to the size, nature, or effect of its decision to utilize PDM. Although there was some disagreement over the use of PDM, it was not substantial.

Plaintiffs rely on two cases from other districts to argue that this analysis was insufficient and to show that there is substantial dispute over the size, nature, and effect of using PDM. After reviewing those cases, the Court finds them inapplicable and incomparable to this case.

The first case Plaintiffs rely on is *Western Watersheds Project v. U.S. Department of Agriculture, Animal and Plant Health Inspection Service*, 320 F. Supp. 3d 1137 (D. Idaho 2018).

In *Western Watersheds*, the BLM, Forest Service, and the Idaho Department of Fish and Game unanimously criticized Wildlife Services-Idaho's proposed action. *Id.* at 1150. As the court explained, that unanimous criticism from the agencies is "unique" and "rare." *Id.* Wildlife Services-Idaho, however, failed to provide convincing responses to their criticism, leading the court to hold that the decision to forego conducting an EIS was arbitrary and capricious. *Id.* Although united in dissent in *Western Watersheds*, the BLM and Forest Service are united in support of the decision to utilize PDM in Nevada. Both the BLM and the Forest Service cooperated with Wildlife Services in the creation of the EA. WS017094. And BLM itself issued a finding of no significant impact. BLMFONSIDR-2576. *Western Watersheds* is simply incomparable to this case.

Plaintiffs also argue that *Wildlands v. Woodruff*, 151 F. Supp. 3d 1153 (W.D. Wash. 2015), shows that Wildlife Services' analysis in the EA was insufficient. But reliance on *Wildlands* is similarly misplaced. There, the court found that a disagreement among experts regarding the effectiveness of the action demonstrated that the action was highly controversial. *Id.* at 1165. The court held that the agency violated NEPA by summarily dismissing the disagreement. *Id.* Unlike in *Wildlands*, Wildlife Services did not summarily dismiss any disagreement among experts in this case. Rather, as the EA clearly demonstrates, Wildlife Services extensively reviewed and discussed opposing views that were presented in scholarship and in the public comments. This discussion included the ones Plaintiffs claim Wildlife Services ignored. *See, e.g.*, WS017581–93 (responding to criticism of PDM); WS017177–78 (discussing Treves et al. 2016's "gold standard" model). Although some controversy over the use of PDM exists, the discussion in the EA demonstrates that there is not a substantial dispute over the efficacy of those methods, and they are not highly controversial.

Moreover, the effects of utilizing PDM are not unknown or highly uncertain. PDM is not a new technique or method of resolving conflicts between humans and wildlife. Quite to the contrary, PDM has been used for over eighty years throughout Nevada, which has demonstrated that PDM does not have a significant effect on the environment. WS017207. Recent use of PDM has further shown that it does not have any significant impact on target animal populations or the

environment.  WS017309; WS017163.  In addition, Wildlife Services thoroughly reviewed the available research on how PDM effects the environment.  Over two hundred pages in the EA were devoted to considering the environmental effects and explaining that they are well-understood.  WS017246–478.  Considering the available scholarship, its years of PDM experience, and recent use of it, Wildlife Services' conclusion that the effects of PDM are not unknown or highly uncertain was reasonable.

In addition, Wildlife Services reached a reasonable conclusion that PDM will not cause a trophic cascade.  PDM consists of short duration operations, removes only a few predators at a time, and is highly selective.  WS017307; WS017392; WS017397–406; WS017599–600.

In short, Plaintiffs have not identified any evidence that would lead the Court to believe that further studies on the effects of PDM would reach conclusions at odds with the studies already in the records and at odds with Wildlife Services' decades of experience.  *See, e.g.*, *WildEarth Guardians v. Wehner*, 526 F. Supp. 3d 898, 911–14 (D. Colo. 2021); *Cascadia Wildlands v. Williams*, 251 F. Supp. 3d 1349, 1362 (D. Or. 2017), *aff'd sub nom. Cascadia Wildlands v. U.S. Dep't of Agric.*, 752 F. App'x 457 (9th Cir. 2018).  As explained above, Wildlife Services' conclusion that the effects of PDM are not highly uncertain or highly controversial was well-reasoned and not arbitrary.  This factor does not weigh in favor of creating an EIS.

### ii.     PDM does not have individually insignificant effects that are cumulatively significant.

Plaintiffs argue that Wildlife Services' PDM activities pose potential significant cumulative impacts to local populations and native ecosystems relating to coyotes and mountain lions.  ECF No. 25 at 24; 40 C.F.R. § 1508.27(b)(7).  Wildlife Services argues in response that it considered the cumulative impacts on coyotes and mountain lions and reached a reasonable conclusion because all sources of take for these animals fell below the sustainable harvest levels.  The Court agrees with Wildlife Services.  In the EA, Wildlife Services analyzed the cumulative take from all sources of coyotes and found that it was less than 25%, WS017306; WS017306; WS017309, which fell below the annual sustainable harvest level of 60%.  WS017310.  And as explained above, a statewide analysis of the effect on coyotes was appropriate.  Similarly, Wildlife

Services analyzed the cumulative take of mountain lions and concluded that all sources of take would not exceed 10%, a number well below the sustainable harvest level of 30%. WSWS017334–39.  Because population data is reported from counties across the state, Wildlife Services were able to conduct the cumulative effects analysis for mountain lions on a county and district level.  WS017334; WS017220–21.  These calculations were sufficient to comply with NEPA's requirement of considering the cumulative effects of PDM.  *See WildEarth Guardians v. Wehner*, 526 F. Supp. 3d 898, 909–10 (D. Colo. 2021).  Thus, Wildlife Services' conclusion that the cumulative effects of PDM were not significant was not arbitrary or capricious.

### iii.　　The EA adequately addresses the safety of PDM activities.

Plaintiffs contend that Wildlife Services failed to adequately consider the potential effects of the use of M-44 sodium cyanide ejectors and lead shot and the risk they pose to public health and safety.  ECF No. 25 at 25; 40 C.F.R. § 1508.27(b)(2).  The EA, however, reflects a thorough and reasonable discussion regarding the health and safety risks of these devices.  *See, e.g.*, WS017417–18 (discussing the use of M-44 sodium cyanide capsules and associated risks); WS017461–62 (discussing the potential impacts and risks from the use of sodium cyanide in M-44s); WS017445–59 (discussing the potential impacts and risks from the use of lead ammunition, including through consumption of lead and exposure to lead fragments in the environment).  This factor does not support the need for an EIS.

### iv.　　PDM will not significantly impair wilderness or wilderness study areas.

Plaintiffs also contend that the factor of proximity to and effect on ecologically critical areas indicates the need for an EIS because Wildlife Services has authorized PDM in wilderness, wilderness study areas, and areas of critical environmental concern (ACECs).  ECF No. 25 at 23. In response, Wildlife Services argues that they reached a reasonable conclusion because the environmental effect of PDM on wilderness and wilderness study areas will not be significant, Plaintiffs did not raise concerns regarding ACECs in their comments, and PDM is not conducted in ACECs.

///

Wildlife Services' conclusion that PDM will not significantly impair wilderness or wilderness study areas was not arbitrary.  As the EA explains, limited PDM is authorized in wilderness and wilderness study areas.  WS017229–42.  The only authorized methods for each setting are ones that are appropriate and that minimize impact on the environment in those areas. *See, e.g.*, WS017239–40.  Use of these methods will occur frequently on only 7.8% of the wilderness and wilderness study area, WS017476–77, and will result in only a small number of animals being removed throughout all wilderness and wilderness study areas, *see* WS017485–86. This relatively minor use of PDM will not result in any substantial impacts to animal populations in those areas. *Id.*  Moreover, authorization of PDM in wilderness and wilderness study areas will not result in any structures being built or any use of motorized vehicles, and it will have only minimal impacts on solitude and recreation uses.  WS017486–87.

Similarly, Wildlife Services reasonably concluded that PDM will not significantly impact ACECs.  As an initial matter, Plaintiffs did not raise this concern in its comment letter.  *See* WS013629–58.  But more importantly, the record shows that Wildlife Services does not conduct PDM in ACECs.  *See* WS017214.

An EIS is not required any time an ecologically critical area is affected by an action; the effect must be significant.  On this record, Wildlife Services reached a reasonable conclusion that PDM will not significantly impair wilderness or wilderness study areas.  This factor therefore does not support the need for an EIS.

### v. Conclusion

As explained above, none of the challenged factors indicate that PDM will have a significant effect on the environment.  Wildlife Services reached a reasoned and non-arbitrary conclusion that an EIS is not required here because PDM will not significantly impact the environment.

### 3. NEPA does not require BLM and the Forest Service to prepare separate NEPA analyses for AWPs.

Plaintiffs claim that BLM and the Forest Service violated NEPA by authorizing wildlife killings through approval of annual work plans (AWPs).  Under their view, the AWPs are a major

1    federal action that require separate NEPA analyses.  But, as Wildlife Services argues, this claim is

2    without merit because the AWPs are not major federal actions.  A major federal action is "an

3    activity or decision subject to Federal control and responsibility."  40 C.F.R. § 1508.1(q).  An

4    activity or decision that does not result in final agency action under the APA is not considered a

5    major federal action.  *Id.* at 1508.1(q)(iii).

6         The AWPs involved in this case are coordination documents in which Wildlife Services,

7    BLM, and the Forest Service communicate about activities on federal land.  WS017086;

8    WS017598; WS020328; WS019850.  They do not determine rights or obligations and are not the

9    consummation of the agency's decision-making process.  *See Bennet v. Spear*, 520 U.S. 154, 177–

10   78 (1997).  That occurs in the EA and finding of no significant impact analyses.  Those analyses

11   and conclusions determined which lands Wildlife Services may employ PDM on, WS017095–98,

12   the types of predators that can be removed, WS017063–64, and the techniques that are permitted,

13   WS017603–23.  The AWPs merely ensure that this previously authorized PDM does not conflict

14   with relevant land management plans when implemented.  Thus, the AWPs are not major federal

15   actions that require separate NEPA analyses.

16        In addition, Plaintiffs' contention that BLM and the Forest Service should have prepared

17   NEPA analyses considering requiring grazing permittees to employ non-lethal techniques is

18   misplaced.  The scope of the EA concerned Wildlife Services' PDM activities; it did not include

19   considering new requirements for grazing permits because Wildlife Services does not issue grazing

20   permits or regulate grazing, and BLM and Forest Service were only cooperating agencies.  *See*

21   WS017731; WS017579–80.

22        Thus, the Court holds that neither the BLM nor the Forest Service violated NEPA by not

23   conducting separate NEPA analyses for the AWPs.

24                            **4.    Conclusion**

25        As explained above, Wildlife Services' conclusion that NEPA does not require the

26   preparation of an EIS was well-reasoned and not arbitrary.  Its statewide analysis of PDM activities

27   was reasonable, PDM would not have a significant impact on the environment, and the agencies

28

conducted appropriate NEPA analyses.  Thus, summary judgment is granted in favor of Wildlife Services because its decision complied with NEPA.

### B.   PDM does not violate the Wilderness Act or related Nevada statutes.

Plaintiffs also claim that PDM violates the Wilderness Act and two Nevada statutes designating certain land as wilderness.   The Wilderness Act prohibits "commercial enterprise … within any wilderness area" except as provided by enumerated exceptions.  16 U.S.C. § 1133(c); *The Wilderness Society v. U.S. Fish & Wildlife Service*, 353 F.3d 1051, 1061 (9th Cir. 2003) (en banc).  Here, an enumerated exception and binding precedent require the Court to conclude that PDM does not violate the Wilderness Act.  The Wilderness Act provides an exception to the general prohibition of commercial enterprises for "the grazing of livestock, where established prior to September 3, 1964."  16 U.S.C. § 1133(d)(4).  As the Ninth Circuit has explained, this exception "includes operations to support that grazing," including "lethal predator control where necessary to protect pre-existing grazing operations."[2]  *Forest Guardians v. Animal & Plant Health Inspection Service*, 309 F.3d 1141, 1142–43 (9th Cir. 2002).  Plaintiffs have not identified any precedent that substantially undermines or is clearly irreconcilable with the *Forest Guardians* decision.  *See Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012).  And they have not identified any persuasive reason why that binding precedent is inapplicable here.  Accordingly, the Court holds that Wildlife Services' management of livestock depredations using PDM does not violate the Wilderness Act, the Lincoln County Conservation, Recreation, and Development Act of 2004, or the Tax Relief and Health Care Act of 2006.

### C.   Wildlife Services acted within its statutory authority.

Plaintiffs contend that Wildlife Services' decision and finding of no significant impact is an ultra vires act because it exceeds Wildlife Services' statutory authority.  ECF No. 25 at 37.  Under the Animal Damage Control Act, Wildlife Services has broad authority to "conduct a

---

[2]   Like the Arizona Wilderness Act of 1984 at issue in *Forest Guardians*, the Lincoln County Conservation, Recreation and Development Act of 2004 and the Tax Relief and Health Care Act of 2006 have provisions that mirror the grazing provision in the Wilderness Act.  *See* Lincoln County Conservation, Recreation, and Development Act of 2004, Pub. L. No. 108-424, Nov. 30, 2004, 118 Stat. 2403; Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, December 20, 2006, 120 Stat. 2922.

program of wildlife services with respect to injurious animal species and take any action … necessary in conducting the program." 7 U.S.C. § 8351.  Here, Wildlife Services acted within its statutory authority by authorizing the use of PDM in relation to predator species.  The EA contained substantial evidence demonstrating that the predators Wildlife Services targets with PDM are injurious.  *See, e.g.*, WS017113–14; WS017116; WS017123–26; WS017132; WS017133; WS01734–37; WS017144–46.  The EA does not authorize Wildlife Services to take any species other than the predators identified and analyzed in the EA, and it limits Wildlife Services to performing PDM work within the scope of the EA.  *See, e.g.*, WS17063–64; WS017098.  If any PDM work outside the scope of the EA is to occur, Wildlife Services will either supplement the EA or prepare a new NEPA document.  *See* WS017098.  Thus, the EA demonstrates that Wildlife Services acted within its broad statutory authority.

> **D.**     **Plaintiffs' motion to consider an extra-record declaration is denied.**

Plaintiffs filed a separate motion asking the Court to consider an extra-record declaration made by Dr. Adrian Treves, a scholar whose work was considered during the EA drafting process. Generally, the APA limits this Court's review to the administrative record, which includes "all documents and materials directly or indirectly considered by agency decision-makers."  5 U.S.C. § 706; *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation and emphasis omitted).  The Ninth Circuit recognizes four narrow exceptions to this rule.  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006).  At issue here are the exceptions for information "necessary to determine whether the agency has considered all relevant factors and has explained its decision," and "when supplementing the record is necessary to explain technical terms or complex subject matter."  *Id.*  Upon review, the Court finds that Treves's declaration does not fall within either of these exceptions.

The relevant factors exception applies only when an agency completely overlooks a relevant subject matter.  *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013).  To qualify for this exception, an extra-record declaration "must do more than raise 'nuanced points' about a particular issue; it must point out an 'entirely new' general subject matter that the defendant agency failed to consider."  *Id.*  Here, Treves's extra-record declaration contains

elaborations of topics thoroughly addressed in the EA, *see, e.g.*, WS017163–78; WS017624–31, and information never presented during the comment period.  It does not raise any new subject matter and does not show that the agency completely overlooked a relevant subject matter.  Accordingly, the Court holds that the declaration does not qualify for the relevant factors exception.

The Court also finds that the information necessary to explain technical terms or complex subject matter exception is inapplicable.  This environmental case contains information that is no more complicated than any other environmental case.  There is not a need for an extra-record declaration to supplement the record for the Court to understand the subject matter.

Accordingly, the motion to consider an extra-record declaration is denied.

**IV.  CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiffs motion for summary judgment (ECF No. 25) is denied and Wildlife Services' cross-motion for summary judgment (ECF No. 33) is granted.

IT IS FURTHER ORDERED that Plaintiffs' motion to consider an extra record declaration (ECF No. 26) is denied.

IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment in favor of all defendants and shall close this case.

IT IS SO ORDERED.

DATED this 28th day of August, 2023.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE